# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DANNY CURTIS LIEB, | ) |
| Petitioner, | ) ) ) |
| vs. | ) ) Case No. 11-CV-326-CVE-PJC |
| ROBERT PATTON, Director,[1] | ) ) ) |
| Respondent. | ) |

## OPINION AND ORDER

Before the Court is the 28 U.S.C. § 2254 habeas corpus petition (Dkt. # 1) filed by Petitioner, a state prisoner appearing pro se. Respondent filed a response (Dkt. # 9) and provided the state court record necessary for resolution of Petitioner's claims (Dkt. # 11). Petitioner did not file a reply. For the reasons discussed below, the petition for writ of habeas corpus is denied.

### *BACKGROUND*

On November 21, 2006, Gary Browning, Ashley Peal, Cecil "Fred" Downs, Bernard Favors, and Petitioner were at a house located at 2834 East 45th Street North in Tulsa, Oklahoma. Browning, Downs, and Petitioner resided at the house. In the early evening hours, Browning and Peal left and went to Brian Ferguson's house, located a few blocks away, where Browning worked on his car and Peal socialized with Ferguson's daughter. Downs, Favors, and Petitioner remained at the house on East 45th Street North. Just after 9:00 p.m. or 10:00 p.m., Downs fell asleep on one of the two couches in the living room and Favors was asleep on the other. Petitioner was sitting in

---

[1] Since Petitioner is currently incarcerated at Davis Correctional Facility, a private prison in Oklahoma, the proper respondent in this case is Robert Patton, Director of the Oklahoma Department of Corrections. See Rule 2, Rules Governing Section 2254 Cases. For that reason, the Court Clerk shall be directed to note the substitution of Robert Patton, Director, in place of Justin Jones, Director, as party respondent.

a chair. Around midnight, Downs awoke when he heard a noise. He got up and saw Petitioner walk down the hall and enter the bathroom. Downs returned to the couch and attempted to go back to sleep. A few minutes later Downs heard Petitioner yell, "You'll never do that again you son of a bitch." Downs heard a "swishing" sound, turned over, and saw Petitioner swinging an iron bar, hitting Favors in the chest and head. The iron bar was a fire poker with a rounded knob handle and an end bent at a 90 degree angle.

After approximately ten blows, Petitioner stopped and walked out the front door. Favors moved his arms and looked as it he were trying to get off of the couch. Petitioner, hearing the commotion, came back in the house, began to hit Favors again with the iron bar, and said, "I told you to sit down." Downs told Petitioner to stop and said, "[y]ou're gonna kill this kid." Petitioner stopped, sat down in a chair, looked at Downs, and asked for a cigarette and a light. Downs complied. As Petitioner smoked the cigarette, Favors started throwing his arms around again. Petitioner "baled up out" of his chair and began beating Favors a third time, yelling, "I told you to sit down. Sit down." Downs ran out of the living room, into a bedroom, threw a space heater at a window to break the glass, and then dove head first out of the window into the front yard. As Downs ran across the street to his sister-in-law's house, Petitioner ran out of the front door, yelling, "where are you going. I'm not going to hurt you."

On November 22, 2006, at approximately 1:30 a.m., police officers were dispatched to the house on East 45th Street North on a report of an assault and battery. The first officers to arrive observed a pool of blood inside the front door and blood on the walls and couch in the living room. The officers entered the house to search for anyone with injuries and found the house empty. Several hours later, the investigation led officers to a field and wooded area with a cell phone tower,

located at 4584 North Delaware Avenue in Tulsa, Oklahoma, approximately 100 yards from the house on East 45th Street North. After a short search of the vegetation along an embankment, police located the body of Favors.

Based on these and other facts developed during an investigation, Petitioner was charged by Amended Information in Tulsa County District Court Case No. CF-2006-5620, with Murder in the First Degree.[2] (Dkt. # 9-3). At the conclusion of a second trial,[3] a jury found Petitioner guilty and recommended a sentence of life imprisonment. (Dkt. # 11-4, Tr. Vol. V at 912). The trial court sentenced Petitioner in accordance with the jury's recommendation. (Dkt. # 9-3). Attorney Marny Hill represented Petitioner at trial.

Petitioner, represented by attorney Richard Couch, perfected a direct appeal to the Oklahoma Court of Criminal Appeals (OCCA). (Dkt. # 9-1). Petitioner raised a single claim of prosecutorial misconduct. Id. In an unpublished Summary Opinion, filed April 7, 2010, in Case No. F-2008-1172, the OCCA affirmed Petitioner's judgment and sentence. (Dkt. # 9-3). The OCCA found that the prosecutor's actions did not deny Petitioner a fair trial. Id. Petitioner did not seek any further post-conviction relief.

On May 25, 2011, Petitioner filed his federal habeas corpus petition (Dkt. # 1). Petitioner raises a single claim of prosecutorial misconduct, the same raised on direct appeal. Respondent argues that the OCCA's decision was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. (Dkt. # 9).

---

[2]Browning was also charged in Case No. CF-2006-5620 with Accessory After the Fact. He entered a guilty plea and was sentenced to fifteen years incarceration. Browning admitted that he assisted Petitioner in disposing of Favors' body.

[3]Petitioner's first trial ended in a mistrial after the jury was unable to reach a verdict.

## ANALYSIS

**A.     Exhaustion/Evidentiary hearing**

As an initial matter, the Court must determine whether Petitioner meets the exhaustion requirements of 28 U.S.C. § 2254(b). See Rose v. Lundy, 455 U.S. 509, 510 (1982). Petitioner fairly presented his habeas claim to the OCCA on direct appeal. Therefore, he has exhausted his state court remedies. As to a separate initial matter, Petitioner has not met his burden of proving entitlement to an evidentiary hearing. See Williams v. Taylor, 529 U.S. 420 (2000); Miller v. Champion, 161 F.3d 1249 (10th Cir. 1998).

**B.     Claim adjudicated by the OCCA**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions. Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 386 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (citations omitted).

When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir.

4

2002). An unreasonable application by the state courts is "not merely wrong; even 'clear error' will not suffice." White, 134 S. Ct. at 1702 (citing Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). The petitioner "'must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id. (quoting Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011); see also Metrish v. Lancaster, 133 S. Ct. 1781, 1787 (2013)).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. Section 2254(d) bars relitigation of claims adjudicated on the merits in state courts and federal courts review these claims under the deferential standard of § 2254(d). Id. at 784; Schriro v. Landrigan, 550 U.S. 465, 474 (2007). Here, the OCCA adjudicated Petitioner's claim on direct appeal. Therefore, Petitioner's claim will be analyzed under the standards of § 2254(d).

As the single ground of error raised in his habeas petition, Petitioner claims that "[p]rosecutorial misconduct denied [Petitioner] a fair trial." (Dkt. # 1 at 5). Petitioner argues the "prosecutor committed misconduct by first asking Gary Browning about 'snitches' and then retaliating excessively after the defense closing argument by implying in rebuttal closing argument that Gary Browning could testify more about the murder but would not because Gary Browning does not want to be killed." Id. at 8. Petitioner appears to argue this was improper vouching by the prosecutor and "[t]he cumulative effective of this improper conduct of the prosecutor was plain error and influenced the verdict against [Petitioner] warranting reversal for a new trial." Id. at 10.

5

Habeas corpus relief is available for prosecutorial misconduct only when the prosecution's conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. 637, 642-48 (1974); Cummings v. Evans, 161 F.3d 610, 618 (10th Cir. 1998). In other words, "absent the infringement of a specific constitutional right, prosecutorial misconduct can result in constitutional error if it 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" DeRosa v. Workman, 679 F.3d 1196, 1222 (10th Cir. 2012) (quoting Donnelly, 416 U.S. at 643). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2006).

To determine whether a trial is rendered fundamentally unfair, the Court examines the entire proceeding, "including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase," as well as "[a]ny cautionary steps – such as instructions to the jury – offered by the court to counteract improper remarks." Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002). "To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution." Fero v. Kerby, 39 F.3d 1462, 1474 (10th Cir. 1994) (quotations omitted); see also Smallwood v. Gibson, 191 F.3d 1257, 1275-76 (10th Cir. 1999).

### 1. Improper examination of a witness

Petitioner first complains that the prosecutor conducted an improper examination of a witness, Petitioner's co-defendant, Gary Browning. (Dkt. # 1 at 8). To better understand the basis of this claim, the Court shall provide additional procedural background information.

Petitioner's counsel filed three motions in limine, ultimately seeking to exclude any reference to Gary Browning at Petitioner's second trial. (Dkt. # 11, Tr. Vol. I at 5; Dkt. # 11-1, Tr. Vol. II at 38). As stated above, Browning pled guilty to Accessory After the Fact, in Tulsa County District Court, Case No. CF-2006-5620. He did not testify at Petitioner's first trial. It was expected that if Browning were called to testify at Petitioner's second trial, he would assert his Fifth Amendment privilege to not incriminate himself.[4] Prior to beginning voir dire during Petitioner's second trial, the prosecutor argued, outside the presence of the prospective jurors, that Browning had no Fifth Amendment privilege because he entered a guilty plea and had been convicted and sentenced. (Dkt. # 11-1, Tr. Vol. II at 39-44). The trial court concluded Browning no longer had a Fifth Amendment privilege with regard to his actions after the murder of Favors. Id. at 44. However, the court stated that Browning retained the privilege "if he feels like he is going to implicate himself" in anything not relating to his plea of guilty to Accessory After the Fact. Id.

The next day, Browning, represented by separate counsel, appeared before the trial court outside the presence of the jury. (Dkt. # 11-2, Tr. Vol. III at 327). Browning's counsel informed the court that she advised Browning that "he does not have a Fifth Amendment right to remain silent . . . and advised him of the possible implications and ramifications of him not answering [counsel's]

---

[4]The record shows that Browning was offered a plea deal with a 10-year term of imprisonment if he agreed to testify against Petitioner. Browning declined that plea offer and was sentenced to 15-years imprisonment. (Dkt. # 11-2, Tr. Vol. III at 337-38).

questions," including being held in contempt of court for refusing to answer certain questions. Id. Browning's counsel stated that Browning would not testify to anything that happened after "Mr. Lieb enters the picture. . . . However, he is willing to answer the question as to whether or not he was involved in anyone's demise." Id. at 330. The trial court told Browning that "if there is something that you have not told anyone about, something you have done in this instance or some other instance, you can invoke your right to the Fifth Amendment in regards to that." Id. at 328. The court also told Browning, "you still have the Fifth Amendment right to not answer any questions you think might implicate you to [sic] something else or something new." Id. at 328-29. Browning stated that he understood. Id.

The trial judge wanted to determine at what point in his testimony would Browning refuse to answer questions and asked the State to assist in making that determination. That State asked Browning whether he had a conversation with Lieb regarding what happened that night, and Browning refused to answer. Id. at 331. The State then asked whether Lieb arrived at Brian Ferguson's house the night of the murder, and Browning refused to answer. Id. at 332. The State asked, "[w]hen you arrived at Mr. Ferguson's house and were working on your car, how long did you work on your car?" Id. Browning responded, "[p]robably for about four or five hours." Id. The trial court asked Browning, "[s]o at that point in time, anything prior to that, Mr. Browning, that she would ask you, you will be answering? Anything prior to you working on your car?" Browning responded, "Yeah, but anything – yeah." Id. This included anything that happened at the house that day before he left to go work on his car. Id. Because Browning refused to answer questions relating to his involvement after the murder, the trial court found Browning in contempt of court and sentenced him to 6 months in jail and a $500 fine. Id. at 334, 338.

After the trial judge made this determination, Petitioner's counsel argued that it would be prejudicial to allow Browning to testify because his testimony would be limited and would "trigger[] constitutional implications for [Petitioner] as well as Bruton[5] and Crawford[6] issues." Id. at 340. The court acknowledged that there was a danger "that during cross-examination all of a sudden he is going to refuse to answer some type of question, and we are going to be in big trouble and without going through this like some kind of skit we are not going to know exactly what he is going to refuse to answer and what he is not." Id. at 343. The trial judge stated that defense counsel would want to ask Browning if he was there when the body was removed and "isn't it true that you were there when you drove the body somewhere else and isn't it true it was your car." Id. at 344. Browning's counsel stated that Browning did "not wish to speak about any of that" because he believed he would be a rat if he discussed anything that occurred after Lieb approached Browning for assistance in disposing of the body. Id. Ultimately, the court allowed Browning to testify "only up to the point of where he leaves the house prior to the murder. . . . If [defense counsel] gets up and cross-examines Mr. Browning about what happens after that, you really weren't working on your car, were you, you are the murderer, . . . then [the prosecutor] gets to bring up the fact of the door is open and we now have a circus of proving Mr. Browning isn't the killer." Id. at 349.

---

[5]In Bruton v. United States, 391 U.S.123 (1968), the Supreme Court held that "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." Spears v. Mullin, 343 F.3d 1215, 1230 (10th Cir. 2003)

[6]In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the Sixth Amendment Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Id. at 38.

The State chose to call Browning as a witness and submitted questions to Browning's attorney to determine if Browning would refuse to answer any of those listed questions. Just prior to the State calling Browning as a witness, defense counsel announced she would not cross-examine Browning "based on the Court's rulings about what we can and cannot ask and the consequences if we ask certain types of questions, making evidence that this Court has ruled is inadmissible potentially making that admissible." (Dkt. # 11-3, Tr. Vol. IV at 641).

Turning to this habeas petition, Petitioner complains that the prosecutor committed misconduct during the direct examination of Browning. (Dkt. # 1 at 8). When Browning took the stand, the prosecutor asked if Browning was a convicted felon and if he was in custody of the Oklahoma Department of Corrections (DOC). (Dkt. # 11-3, Tr. Vol. IV at 644). Browning answered affirmatively. Next, the prosecutor asked, "can you tell me what a snitch is?" Id. at 645. Defense counsel objected to the relevance and the trial court overruled the objection. Browning responded, "[a] snitch is someone that tells on someone." Id. The prosecutor then asked,

> Q: And when you're housed in Department of Corrections, is being a snitch a good thing or a bad thing?
>
> A: A bad thing.
>
> Q: What happens to snitches in DOC?
>
> A: Most of them get killed.
>
> Q: When you're in Tulsa County Jail, what happens to snitches?
>
> MS. HILL: Objections as to relevance.
> THE COURT: Overruled.
> THE WITNESS: You'll get beat on or killed.

Id. Petitioner believes this line of questioning was improper and amounts to prosecutorial misconduct. The OCCA found this testimony "was relevant to the witness's bias and properly admitted." (Dkt. # 9-3).

After examining the trial transcripts in their entirety, including hearings and bench conferences outside the presence or hearing of the jury, the Court finds that it is possible that a jury, if privy to these discussions, could reasonably believe that the prosecutor used testimony as to the consequences of snitching to imply that this witness, under different circumstances, would provide additional information and evidence to support the case against Petitioner. However, the jury was not privy to the hearings and bench conferences regarding Browning's testimony. Instead, the jury heard that (1) Browning was a two-time convicted felon currently in DOC custody and knew what happened to snitches in DOC custody; (2) Browning was a long-time friend of almost every witness involved in this case; (3) Browning left the house with Ashley Peal sometime that evening; and (4) before the murder, Browning went to Brian Ferguson's house, located two blocks from Browning's house, to work on his car. (Dkt. # 11-3, Tr. Vol. IV at 644-49). The jury also did not know Browning had already pled guilty to Accessory After the Fact. (Dkt. # 11-2, Tr. Vol. III at 351-53). Browning's testimony before the jury corroborated the testimony of other witnesses who said Browning and Peal left before the murder and did not return. Even if the prosecutor's questions were improper, the jury was able to judge the evidence fairly despite the prosecutor's conduct. Petitioner fails to show this line of questioning deprived him of a fundamentally fair trial. Petitioner fails to show the OCCA's decision was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. Habeas relief is denied on this ground.

### 2. Closing argument

Petitioner also claims the prosecutor committed misconduct during closing argument "by implying . . . that Gary Browning could testify more about the murder but would not because Gary Browning does not want to be killed." (Dkt. # 1 at 8). Petitioner argues this was improper vouching and the "cumulative effect . . . was plain error and influenced the verdict against [Petitioner]." Id. at 9-10. On direct appeal, the OCCA reviewed this claim for plain error and determined that the prosecutor's comments were in response to comments made by defense counsel "and were fair comments on evidence affecting the credibility of a witness." (Dkt. # 9-3 at 1-2).

Argument or evidence is permissible vouching unless "'the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony.'" Thornburg v. Mullin, 422 F.3d 1113, 1132 (10th Cir. 2005) (quoting United States v. Magallanez, 408 F.3d 672, 680 (10th Cir.2005) (internal quotation marks omitted)); see also United States v. Bowie, 892 F.2d 1494 (10th Cir. 1990). A prosecutor's vouching for the credibility of witnesses can "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury[,] and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." United States v. Young, 470 U.S. 1, 18-19 (1985) (citing Berger v. United States, 295 U.S. 78, 88-89 (1935)). Yet, "[i]mproper vouching for witnesses is not considered to impact an express constitutional right." United States v. Harlow, 444 F.3d 1255, 1266 (10th Cir. 2006); Parker v. Scott, 394 F.3d 1302, 1310 (10th Cir. 2005). A habeas court reviews such claim for a denial of due process and "'must find that the absence of

[fundamental] fairness infected the trial [and] the acts complained of must be of such quality as necessarily prevents a fair trial.'" Parker, 394 F.3d at 1310-11 (quoting Lisenba v. California, 314 U.S. 219, 236 (1941)).

After reviewing the record, the Court finds that Petitioner was not denied due process as a result of the prosecutor's remarks during rebuttal argument. These statements were fair comments based on the evidence. During her closing argument, defense counsel suggested that Browning was warning Petitioner about what happens to snitches in DOC custody. (Dkt. # 11-4, Tr. Vol. V at 884). Counsel stated, "when the State asked [Browning] what a snitch was and what happens to snitches, as he sat there on the witness stand, looked over to his right[,] right at Danny and said, '[t]hey die in prison.' Ladies and gentlemen, I suggest to you that [Browning] wasn't telling you what happens when people talk, but based on his demeanor – ." Id. The State objected and the trial court called both attorneys to the bench. The trial court asked Petitioner's counsel,

> THE COURT: Ms. Hill, are you going to try to argue that Mr. Browning was implicating that Mr. Lieb would be a snitch and, therefore, he would be killed? Is that what you are getting ready to say?
>
> MS. HILL: No, ma'am. I mean I think that the jury can draw their own conclusions, but no, I'm not going to say that.
>
> THE COURT: Well, what are you saying? Are you saying that so that they can draw that conclusion?
>
> MS. HILL: No, ma'am. I was ending it with the sentence that I just spoke.
>
> THE COURT: Okay. Well, I want to know why you spoke that sentence, I guess. Are you wanting the jury to have that conclusion? Is that why you said that?
>
> MS. HILL: Well, I think the fact that the witness did appear intimidating when he was on the stand. The jury can consider the demeanor of the witnesses as well.
>
> THE COURT: I am either going to ask them to disregard your last statement or I am going to let Ms. Keely in her closing argument make a comment on the fact that Mr.

13

> Browning could be scared that he was a snitch against your client and make that implication as well.
>
> MS. HILL: Well, if that's what she is going to argue in her rebuttal closing, then I am probably going to hit this [] harder.
>
> THE COURT: I am just saying, if that's what you are inferring in your – but then, I guess, we are anticipating that – I mean, the evidence came out, he did testify in regards to snitches. So that implication is by the State that he would be snitching on Mr. Lieb, so I think she has the right to argue it could be the reverse; correct?
>
> MS. HILL: Yes, ma'am.
>
> THE COURT: So she is doing that. You will comment on your close and we will go forward from there. Thank you for clearing that up. Overruled.

Id. at 884-86. Defense counsel chose to move forward with her implication that Browning warned Petitioner what happened to snitches, see id. at 886, and opened the door to the prosecutor's rebuttal.

> During rebuttal, the prosecutor stated,
>
> [Ashley Peal] and [Downs] both said that the people who were left at the house was [sic] [Downs], Bernard [Favors] and [Petitioner].
> Now, you recall that the testimony stopped there with regard to [Browning]. We talked to [Browning]. And do you remember what [Browning] told you? Counsel reminded you, he's in DOC. He's a two-time convicted felon. What happens to snitches in DOC? They die. He's going back. He told you that. That's where his testimony stopped. He doesn't want to die.

Id. at 893. The statement is responsive to defense counsel's statement and directly challenged defense counsel's implication. The statement also conformed with the trial court's instruction. Under the circumstances, the prosecutor's rebuttal statement was appropriate and did not prejudice Petitioner. See Young, 470 U.S. at 12-13 ("to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks

14

were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction.").

Further, the strength of the evidence against Petitioner was strong. Downs, an eye witness, testified that he was in the room when he heard Petitioner say, "[y]ou'll never do that again you[] son of a bitch." (Dkt. # 11-2, Tr. Vol. III at 438). Downs testified that he heard a "swishing sound" and saw Petitioner swinging a "big iron bar." Id. at 439. Downs saw Petitioner beat Favors three separate occasions and Petitioner yelling, "I told you not to move" and "I told you to sit down." Id. at 440-47. These beatings resulted at least eighteen wounds to Favors' chest and torso and eight wounds to his head. The cause of death was a blunt penetrating wound to the heart and eight separate skull fractures. (Dkt. # 11-4, Tr. Vol. V at 829, 833). The blood splatter evidence and patterns corroborated Downs' testimony and description of how Petitioner swung the iron bar. (Dkt. # 11- 3, Tr. Vol. IV at 695-98). Another witness, Robert Stark, saw Downs dive head-first out of a bedroom window and Petitioner run out the front door after Downs, yelling at Downs and asking Downs where he was going. (Dkt. # 11-2, Tr. Vol. III at 535). Peal testified that she saw Petitioner standing outside Brian Ferguson's house just after midnight, wearing only a tank top and boxer shorts with blood on his arms and hands. Id. at 415-16. Finally, on November 24, 2006, when Petitioner was arrested by Ponca Eagle Tribal authorities outside Ponca City, Oklahoma, for public intoxication, he told the booking officers, "I'm a cold-blooded killer and . . . I don't give a shit about you guys. . . . I'm going to jail for the rest of my life." (Dkt. # 11-3, Tr. Vol. IV at 758).

When viewed in the context of the entire trial and in light of the weight of the evidence against Petitioner, the prosecutor's statements during rebuttal argument did not deprive Petitioner of a fundamentally fair trial. The statements were appropriate and based on evidence presented at

15

trial. Additionally, there was no cumulative effect that influenced the verdict against Petitioner. Petitioner fails to show that the OCCA's adjudication of Petitioner's claim on direct appeal was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. Habeas relief is denied on this ground.

## C. Certificate of appealability

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing." A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In this case, the Court concludes that a certificate of appealability should not issue. Nothing suggests that the Tenth Circuit would find that this Court's application of AEDPA standards to the decision by the OCCA is debatable among jurists of reason. See Dockins v. Hines, 374 F.3d 935, 938 (10th Cir. 2004). The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

*CONCLUSION*

After careful review of the record in this case, the Court concludes that Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States. Therefore, his petition for writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Court Clerk shall note on the record the substitution of Robert Patton, Director, in place of Justin Jones, Director, as party respondent.

2. The petition for writ of habeas corpus (Dkt. # 1) is **denied**.

3. A separate judgment in favor of Respondent shall be entered in this matter.

4. A certificate of appealability is **denied**.

**DATED** this 28th day of August, 2014.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE